IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MICHAEL PATTERSON, | § | |
| | § | |
| Defendant Below, | § | No. 505, 2025 |
| Appellant, | § | |
| | § | Court Below: Court of Chancery |
| | § | of the State of Delaware |
| LADY BENJAMIN PD CANNON | § | |
| f/k/a Ben Cannon, | § | |
| | § | C.A. No. 2021-0171 |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: April 15, 2026
Decided: June 29, 2026

Before **SEITZ**, Chief Justice, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices; and **WALLACE**, Judge,[1] constituting the Court *en Banc*.

Upon appeal from the Court of Chancery, **AFFIRMED in part, REVERSED in part, and REMANDED.**

A. Thompson Bayliss, Esquire (*argued*), S. Michael Blochberger, Esquire, Bryan M. Blaylock, Esquire, ABRAMS & BAYLISS LLP, Wilmington, Delaware, Brian E. Klein, Esquire, Brian M. French, Esquire, COOLEY LLP, New York, New York, Ephraim A. McDowell, Esquire, COOLEY LLP, Washington, DC, *Attorneys for Defendant Below/Appellant Michael Patterson*.

Brett D. Fallon, Esquire, Patrick A. Jackson, Esquire (*argued*), Jaclyn C. Marasco, Esquire, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, DE, Mark D. Taticchi, Esquire, Elizabeth M. Casey, Esquire, FAEGRE DRINKER BIDDLE &

---

[1] Sitting by designation under DEL. CONST. art. IV, § 12 and Supreme Court Rules 2(a) and 4(a) to complete the quorum.

REATH LLP, Philadelphia, PA, M. Cris Armenta, Esquire, M. CRIS ARMENTA, PC, *Attorneys for Plaintiff Below/Appellee Lady Benjamin PD Cannon*.

**LEGROW**, Justice:

This appeal turns on the sufficiency of a description of collateral in a Securities Pledge Agreement dated March 2, 2017 (the "Pledge Agreement") that is subject to the Delaware Uniform Commercial Code (the "UCC"). The Court of Chancery concluded that the collateral was not sufficiently described, no security interest attached to the collateral, and, as a result, the secured party's disposition of the collateral after default constituted conversion. We conclude that the Pledge Agreement sufficiently described the collateral and therefore reverse the Court of Chancery's judgment.

The collateral at issue is a warrant that allowed Lady Benjamin Cannon to purchase common stock in Romeo Systems, Inc. ("Romeo Systems" or the "Company"). Cannon pledged her sole Romeo Systems warrant as collateral for a $20,000 personal loan from the Company's founder, Michael Patterson. The Pledge Agreement described the collateral as "a warrant to purchase Common Stock . . . for one million shares." Cannon, however, owned no such warrant. Her warrant was for one percent of Romeo Systems's common stock, measured at the time of exercise rather than at issuance. After rejecting Patterson's argument that the warrant was invalid and unenforceable, the Court of Chancery held that the descriptive mismatch in the Pledge Agreement defeated the security interest: the Pledge Agreement described a fixed-share warrant, while Cannon held a fixed-percentage warrant. Because Cannon's warrant was not a fixed-share warrant, the description of a fixed-

share warrant could not reasonably identify it. The court accordingly held that Patterson's actions in causing the warrant to be transferred into his own name and later exercising it constituted conversion, and the court entered judgment against him in excess of $40 million. We affirm the court's holding that the warrant was a valid and enforceable contract but reverse the conclusion that no security interest attached.

Section 9-108 of Delaware's UCC provides that a description of collateral "is sufficient, whether or not it is specific, if it reasonably identifies what is described."[2] The UCC expressly rejects any requirement that the description be "exact and detailed."[3] The Pledge Agreement here identified the collateral by type, quantity, issuer, holder, and underlying equity security. The description's reference to "one million shares" was inaccurate: the warrant entitled the holder to a percentage of Romeo Systems's stock at exercise, not a fixed number of shares at issuance. The description nonetheless made the pledged collateral identifiable. Cannon owned only one Romeo Systems warrant, and every other feature of the description matched it. Because the description reasonably identified the collateral, a security interest

---

[2] 6 *Del. C.* § 9-108(a). Citations to the Delaware Uniform Commercial Code are to the current codification. The Article Nine provisions governing the November 2018 transfer were amended in 2023, *see* 84 Del. Laws c. 174 (2023) (eff. Aug. 18, 2023), which replaced "authenticated" with "signed" to conform to the 2022 amendments to the Uniform Commercial Code. That amendment modernized terminology and did not alter the substance of the provisions discussed here.

[3] *See id.* § 9-108 cmt. 2.

2

attached, and the Court of Chancery's judgment must be reversed.  We therefore **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion.

## I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[4]

### A. The Warrant

Michael Patterson founded Romeo Systems in 2014, incorporated it in Delaware, and developed it into a start-up focused on designing a portable device to capture and store kinetic energy.  The Company's certificate of incorporation authorized the issuance of up to ten million shares of common stock.  Patterson served as Romeo Systems's Chief Executive Officer and sole director through the period when the transactions at issue were negotiated and executed, stepping down as CEO on September 4, 2020, and leaving the Board shortly before the closing of a merger in December 2020.

Romeo Systems retained Lady Benjamin Cannon as a paid consultant under a Consulting Agreement dated December 29, 2014, at a rate of $575 per day.  The Company had no funding sources at the time, so Patterson personally paid Cannon for her services.

---

[4] Unless otherwise noted, the recited facts are taken from the Court of Chancery's October 7, 2025 Post-Trial Memorandum Opinion.  *See Cannon v. Romeo Sys., Inc.*, 2025 WL 2848069 (Del. Ch. Oct. 7, 2025) (footnotes and record citations omitted) [hereinafter the "Opinion at __"].  These factual findings are largely uncontested by the parties on appeal.

On August 10, 2015, Cannon sent Patterson a demand for $31,206.97 in unpaid services, late fees, and termination fees, threatening to "commence legal action" against Romeo Systems, Patterson, Patterson's previous company InAuth, and Bain Capital Ventures, an InAuth investor, unless payment was made.[5] Nine days later, Patterson offered to "pay you $13k and . . . grant you equity of 1%," and Cannon responded: "Assuming a non-dilution guarantee, Done."[6] The parties executed a Full and Final Release that same day, in which Cannon agreed to a

> full release upon receipt of $13,000.00 on or before 8/21/15, and a document(s) or stock certificates guaranteeing [her] 1%, "full ratchet" non-dilatable [sic], shares of Romeo Systems [ ] . . . to be issued to CANNON no later than Aug 31, 2015.[7]

Patterson emailed Cannon a draft warrant (the "Draft Warrant") on August 30, 2015, prepared by outside counsel. The Draft Warrant entitled its holder to purchase up to one percent of Romeo Systems's common stock on a fully diluted basis at the *time of issuance*, with an exercise price of $0.01 per share and an expiration date of August 31, 2018.

Cannon sent the Draft Warrant to her attorney, Marc Indeglia, for review. On October 19, 2015, Indeglia returned to Cannon clean and redline versions with

---

[5] Opinion at *3.

[6] *Id.*

[7] *Id.*; *see also* App. to Appellant's Opening Br. at A332.

4

proposed revisions that changed the measurement date from issuance to *exercise*. Under Indeglia's revisions, the Holder would have the right to purchase "duly authorized and validly issued Common Stock equal to the Applicable Percentage of the Common Stock Deemed Outstanding, in each case, on the date of any exercise of this Warrant."[8] Indeglia also added definitions for "Applicable Percentage," "Common Stock Deemed Outstanding," and related terms, and extended the expiration date to August 31, 2025.[9]

Nearly four months after Patterson sent the Draft Warrant, on Christmas Day 2015, Cannon emailed Patterson a signed PDF of the revised warrant (the "Warrant") and asked him to countersign. She did not flag any of the revisions, nor did she include tracked changes or a redline to the Draft Warrant. Patterson countersigned the Warrant three days later and returned it to Cannon via email: "Please see the executed sig page attached. You are recorded as of today."[10] Patterson testified that he "glanced at" the Warrant before signing it, and he admitted at trial that he could have read it fully or sent it to counsel but did neither.[11]

---

[8] Opinion at *4.

[9] *Id.*

[10] *Id.* at *5.

[11] *Id.* at *5 n.36.

5

In December 2016, at Patterson's request, Cannon resent the executed Warrant to Patterson. Patterson forwarded it to Lauren Webb, then a company consultant and soon-to-be its Chief Financial Officer, and to new Romeo Systems counsel at Orrick, Herrington & Sutcliffe. Webb recorded the Warrant on Romeo Systems's capitalization table as a warrant for 100,000 shares. On February 12, 2017, the Board executed a unanimous written consent ratifying the issuance of Cannon's "warrant to purchase 100,000 shares of Common Stock" and authorizing a ten-for-one stock split, which was completed nine days later.[12] The Company's capitalization table was updated after the stock split to list the Warrant as one for 1,000,000 shares.

In July 2018, KPMG, an auditor reviewing Romeo Systems for a potential counterparty, flagged the discrepancy between the Warrant's fixed-percentage terms and Romeo Systems's fixed-share treatment of the Warrant on its capitalization table. Romeo Systems did not take any steps to address the discrepancy. Separately, on July 18, 2018, at Webb's request, Patterson re-executed the Warrant via DocuSign.

---

[12] *Id.* at *6.

6

## B. The Pledge Agreement

In February 2017, Cannon sought Patterson's assistance in retaining counsel for a criminal matter unrelated to Romeo Systems. Patterson agreed to loan Cannon $20,000, payable directly to her criminal defense counsel in two equal installments, on the condition that Cannon pledge her Romeo Systems equity as collateral. On March 2, 2017, Orrick emailed Patterson and Cannon a promissory note dated March 1, 2017, and the Pledge Agreement dated March 2, 2017. Cannon executed and returned both documents the following day without proposing any changes.

The Pledge Agreement granted Patterson a first-priority security interest in the "Pledged Assets," defined as "(a) a warrant to purchase Common Stock in the Issuer [Romeo Systems] for one million shares"; and "(b) all proceeds of any of the foregoing."[13] Paragraph 8(a) set forth Patterson's self-help remedy on Cannon's default:

> The Secured Party may, after the occurrence and during the continuance of a default in the performance or observance of the Obligations, without notice and at [his] option, transfer or register the Pledged Assets or any part thereof into [his] or [his] nominee's name with or without any indication that such Pledged Assets is subject to the lien created hereunder.[14]

---

[13] *Id.*

[14] Opinion at *7; App. to Appellant's Opening Br. at A1737.

7

Paragraph 8(b) further granted Patterson, upon default, "all of the rights and remedies with respect to the Pledged Assets of a secured party under the Uniform Commercial Code," including the right to sell the Pledged Assets at public or private sale.[15] Paragraph 8(c) required Patterson, absent specified exigencies, to give the Pledgor at least ten days' notice of any public sale or of the time after which any private sale or other intended disposition would occur.[16] The Pledge Agreement also contained an exculpation provision limiting Patterson's liability for "any acts, omissions, errors of judgment or mistakes of fact or law" absent gross negligence or willful misconduct.[17]

## C. Partial Exercise of the Warrant and Disposition

The promissory note matured on March 1, 2018. Cannon did not repay any portion of it and defaulted on the loan. On November 16, 2018, at Patterson's instruction, Romeo Systems transferred the Warrant from Cannon to Patterson and registered it in his name. The Court of Chancery found that Cannon received no notice of the transfer and did not consent to it.

On October 5, 2020, Romeo Systems announced that it had entered into an Agreement and Plan of Merger with RMG Acquisition Corp. under which the

---

[15] *Id.*

[16] *Id.*

[17] Opinion at *7 n.60.

surviving public company would adopt the name Romeo Power, Inc. (the "de-SPAC Merger"). Three weeks later, on October 27, 2020, Patterson exercised the Warrant in part, acquiring 1,000,000 shares of Romeo Systems common stock. By its terms, however, the Warrant entitled its holder to purchase one percent of Romeo Systems's Common Stock Deemed Outstanding at the time of exercise, and the 1,000,000 shares that Patterson took represented substantially less than that one-percent entitlement. Patterson retained the balance of the Warrant without exercising it.

After learning of the planned de-SPAC Merger, Cannon retained Indeglia. On November 23, 2020, Indeglia emailed Romeo Systems's deal counsel at Paul Hastings LLP to confirm Cannon's interest in the Warrant. Four days later, David Hernand of Paul Hastings responded that the Warrant had been "transferred to Mr. Patterson in satisfaction of the loan amount" and that "Cannon no longer has an interest in such warrant."[18] Indeglia replied on December 1, 2020, taking the position that no security interest had ever attached because of the discrepancy between the Warrant and the Pledge Agreement, and that even if one had attached, Cannon retained a right to redeem the Warrant because Patterson's purported strict

---

[18] *Id.* at *9.

foreclosure had not complied with Article Nine of the UCC. Hernand did not respond.

The de-SPAC Merger closed on December 29, 2020. Each outstanding share of Romeo Systems common stock was converted into 0.121730 shares of Romeo Power common stock. Under that ratio, the 1,000,000 Romeo Systems shares that Patterson had obtained through his partial exercise of the Warrant converted into 121,730 Romeo Power shares. Had Patterson instead exercised the Warrant in full for one percent of Romeo Systems's Common Stock Deemed Outstanding at the time of exercise, it would have yielded 965,246 Romeo Power shares—roughly eight times what Patterson actually received. Patterson maintained control of the Warrant from the November 2018 transfer through the de-SPAC Merger's consummation, and the unexercised portion of the Warrant was extinguished when the de-SPAC Merger closed. Romeo Power shares traded at a high of $31.01 on the day of closing and $32.73 the following day.

After the merger, Patterson held 14,241,222 Romeo Power shares, including the shares that he obtained by partially exercising the Warrant. Patterson was subject to a 180-day post-merger lock-up and could not trade his Romeo Power shares until June 28, 2021. The day the lock-up expired, Patterson sold 2,612,399 shares in three tranches. He sold another 9,560,000 shares over the following four months. Together, those sales generated gross proceeds of $69,674,458.10.

While the parties were engaged in written discovery in this litigation, Patterson's counsel sent Cannon a letter captioned "Notification of Disposition of Collateral," stating that Patterson intended to sell the Warrant Shares, that Cannon was "entitled to an accounting of the unpaid indebtedness," and that Cannon "may redeem the collateral" by tendering payment of the debt, interest, and reasonable attorneys' fees.[19]  Indeglia responded on April 8, 2022, disputing that Patterson was still holding the Warrant Shares as collateral.  Indeglia observed that Patterson's 2022 position was inconsistent with his prior representation to the Romeo Systems Board "that the transfer of the Warrant to Mr. Patterson was in satisfaction of Ms. Cannon's obligations under the note," and with Patterson's and Romeo Power's SEC filings, which reflected Patterson as the beneficial owner of the underlying shares without any notation that he held them as a secured party.[20]

On May 16, 2022, Patterson's counsel sent a letter to Indeglia representing that Patterson had sold all 121,730 of his post-merger warrant shares on a public exchange on May 3, 2022 for $141,023.49, and that, after deducting fees, loan principal, and interest, $108,802.24 remained for Cannon.  Patterson remitted this amount to Cannon in two installments on May 16, 2022 and August 11, 2023.  The

---

[19] *Id.* at *10.

[20] *Id.* at *11.

Court of Chancery found, however, that "Patterson has presented no admissible evidence to substantiate that he sold any shares of Romeo Power stock on May 3, 2022, let alone the Warrant Shares."[21]

## D. Procedural History

Cannon filed suit in the Court of Chancery against Romeo Systems, Romeo Power, and Patterson on February 26, 2021. The Amended Complaint asserted five counts: declaratory relief as to Cannon's rights in the Warrant, noncompliance with UCC Article Nine against Patterson, conversion against Patterson, breach of contract against the Romeo Defendants, and wrongful registration of securities under the UCC against the Romeo Defendants. After Romeo Power was liquidated in 2023, counsel for the Romeo entities withdrew, and on October 20, 2023, the Court of Chancery entered default judgment against both corporate entities on Counts IV and V.

The claims against Patterson proceeded through a three-day bench trial, post-trial briefing, argument, and post-argument submissions. On October 7, 2025, the Court of Chancery issued a post-trial Memorandum Opinion ruling in Cannon's favor. The court first held that the Warrant was a valid and enforceable contract for

---

[21] *Id.*

12

one percent of Romeo Systems's common stock at the time of exercise.[22]  Applying the objective theory of contract formation, the court found that Patterson's execution of the Warrant on behalf of Romeo Systems was "the strongest evidence of an intent to be bound."[23]  The court concluded that Patterson, as Romeo Systems's CEO and sole director, could not escape the agreement by invoking his failure to read it.[24]

The court next held that no security interest attached to the Warrant under Article Nine because the Pledge Agreement did not reasonably identify the collateral.[25]  Applying 6 *Del. C.* §§ 9-108 and 9-203(b), the court concluded that the description of the collateral as a warrant for "one million shares" did not reasonably identify the Warrant because Cannon held a fundamentally different instrument—a fixed-percentage warrant for one percent of Romeo Systems's common stock at the time of exercise.[26]  The court also rejected Patterson's equitable-estoppel defense, holding that principles of equity may supplement but not supplant the UCC's requirements.[27]  Because no security interest had attached, the court held that Patterson had no lawful authority to cause Romeo Systems to transfer the Warrant

---

[22] *Id.* at *20.

[23] Opinion at *14.

[24] *Id.* at *16.

[25] *Id.* at *28.

[26] *Id.* at *26, *28.

[27] *Id.* at *30–*31.

into his name in 2018, to exercise it in 2020, or to retain and later sell the resulting Romeo Power shares.[28] Each of those acts, the court held, constituted "a[] distinct act of dominion wrongfully exerted over the property of another," rendering Patterson liable for conversion.[29]

The court awarded Cannon damages of $27,419,743.12, plus pre- and post-judgment interest at the legal rate compounded quarterly, computed net of Patterson's $108,802.24 in remittances as of the dates that they were paid.[30] The court rejected Patterson's argument that damages should be discounted for a 180-day post-merger lock-up, finding no persuasive evidence that Cannon would have been subject to any lock-up.[31] The court also rejected Patterson's argument that damages should be limited to the 121,730 shares that he actually received, holding that Patterson "converted the entire Warrant and chose to exercise the converted Warrant for 1,000,000 shares."[32]

Final judgment was entered on November 17, 2025, in the total amount of $40,735,296.20, inclusive of interest. Patterson filed a timely notice of appeal. On

---

[28] *Id.* at *32–*34.

[29] Opinion at *32 (quoting *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)).

[30] *Id.* at *37–*39.

[31] *Id.* at *36.

[32] *Id.* at *38.

14

March 24, 2026, Patterson moved to expedite further proceedings and asked that the previously scheduled May 20, 2026 oral argument be advanced.[33] We granted the motion and heard argument on an expedited basis on April 15, 2026. We issued an order reversing the Court of Chancery's judgment on April 17, 2026, and reserved jurisdiction in this Court solely for the purpose of issuing this Opinion.[34]

## II.  STANDARD OF REVIEW

We review a final, post-trial judgment of the Court of Chancery under well-settled standards. Questions of law, including contract interpretation, are reviewed *de novo*.[35] We review the court's factual findings, including whether a party manifested an intent to be bound by a contract, for clear error and will not disturb them if they are "sufficiently supported by the record and are the product of an orderly and logical deductive process."[36]

---

[33] *See* Appellant Michael Patterson's Motion to Expedite Further Proceedings on Appeal, No. 505, 2025 (Del. filed Mar. 24, 2026).

[34] *Michael Patterson v. Lady Benjamin PD Cannon f/k/a Ben Cannon*, 2026 WL 1066033, at *1 (Del. Apr. 17, 2026) (TABLE).

[35] *Gatz Props., LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1212 (Del. 2012); *Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 38 (Del. 2005).

[36] *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972); *see also SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1128 (Del. 2015); *Nationwide Emerging Mgrs., LLC v. NorthPointe Hldgs., LLC*, 112 A.3d 878, 889 (Del. 2015).

## III. ANALYSIS

Patterson raises five arguments on appeal. *First*, he contends that Cannon is equitably estopped from raising, and has waived, any challenge to the sufficiency of the Pledge Agreement's collateral description because she repeatedly affirmed the accuracy of that description.[37] *Second*, Patterson argues that even if the description of the collateral as a warrant for "one million shares" contained an inaccuracy, it nonetheless reasonably identified Cannon's only Romeo warrant, satisfying 6 *Del. C.* § 9-108.[38] *Third*, Patterson contends that the description was accurate in any event because no meeting of the minds occurred on a warrant for one percent of outstanding stock at the time of exercise, given that Cannon altered the Draft Warrant without disclosing her revisions before Patterson countersigned it.[39] *Fourth*, Patterson invokes the Pledge Agreement's exculpation provision, which he reads to shield him from liability for "any acts, omissions, errors of judgment or mistakes of fact or law" absent gross negligence or willful misconduct.[40] *Fifth*, Patterson challenges the damages award as an abuse of discretion.[41]

---

[37] Appellant's Opening Br. at 20–28.

[38] *Id.* at 29–34.

[39] *Id.* at 35–39.

[40] *Id.* at 40–44.

[41] *Id.* at 45–48.

16

Cannon defends the Court of Chancery's judgment on each point and additionally offers an alternative ground for affirmance. Cannon contends that, even if Patterson held a valid security interest in the Warrant, his November 2018 transfer of the Warrant "in satisfaction of the loan amount" was an ineffective strict foreclosure under 6 *Del. C.* § 9-620 because he provided no notice to her and did not obtain her consent.[42] In Cannon's view, that noncompliance deprived her of the statutory redemption right that the UCC guarantees and itself constituted conversion.[43]

**A. Patterson validly held a security interest in the Warrant.**

The Court of Chancery held that Patterson had no valid security interest in the Warrant because the Pledge Agreement did not reasonably identify the collateral. We reverse. We agree with the Court of Chancery that the Warrant is a valid and enforceable contract between Romeo Systems and Cannon for one percent of Romeo Systems's Common Stock Deemed Outstanding at the time of *exercise*, rather than at the time of *issuance* as Patterson contends.[44] We disagree, however, with the court's conclusion that the Pledge Agreement's description of the collateral as "a warrant to purchase Common Stock in [Romeo Systems] for one million shares"

---

[42] Appellee's Answering Br. at 34–37.

[43] *Id.* at 35–36.

[44] Opinion at *20.

failed to reasonably identify the Warrant under Section 9-108.[45]  Although the description was imperfect, it identified Cannon's one-and-only Romeo Systems warrant and was sufficient to cause a security interest to attach under Section 9-203(b).[46]

### 1. The Warrant is valid and enforceable according to its express terms.

We begin by addressing Patterson's third argument on appeal:  that the parties never agreed to a warrant for one percent of Romeo Systems's outstanding stock. Under Delaware law, "a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[47]  Patterson challenges the first element, contending that Romeo Systems never manifested an intent to be bound by the Warrant in the form that Cannon now seeks to enforce.[48]

---

[45] *Id.* at *25–*26, *28 (reasoning that "a description of a fixed-share warrant does not sufficiently describe a fixed-percentage warrant").

[46] Because we hold that Patterson validly had a security interest in the Warrant, we need not address Patterson's estoppel argument on appeal.

[47] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

[48] Cannon argues as a threshold matter that Patterson lacks standing to challenge the Warrant's validity because he is neither a party to the Warrant nor a third-party beneficiary of it; he signed only in his capacity as Romeo Systems's CEO.  Appellee's Answering Br. at 19 (citing *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007)).  The Court of Chancery rejected that argument, permitting Patterson to raise the Warrant's validity defensively in resisting Cannon's conversion claim rather than as an affirmative challenge to enforcement. Opinion at *14 n.129.  We agree.  A defendant sued for converting property may contest the property interest on which the plaintiff's claim depends, even where the defendant could not have

18

The Court of Chancery's conclusion that Romeo Systems manifested its assent to be bound by the Warrant as written was not clearly erroneous. "[O]vert manifestation of assent—not subjective intent—controls the formation of a contract."[49] Whether a party manifested an intent to be bound "is to be determined objectively based upon [its] expressed words and deeds as manifested at the time rather than by [its] after-the-fact professed subjective intent."[50] "[W]here the putative contract is in the form of a signed writing, that document generally offers the most powerful and persuasive evidence of the parties' intent to be bound."[51]

Patterson signed the Warrant on behalf of Romeo Systems on December 28, 2015.[52] The Warrant on its face contained no ambiguity. Its first page, in a boldface header, described it as a warrant to purchase up to 1.0% of Romeo Systems's common stock on a fully diluted basis "at the *Time of Exercise*."[53] Section 1(a) provided that the Holder was entitled to purchase a number of shares equal to the "Applicable Percentage of the Common Stock Deemed Outstanding . . . on the date

---

sued in the first instance to set aside the underlying contract. *Kronenberg v. Katz*, 872 A.2d 568, 605 n.74 (Del. Ch. 2004).

[49] *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014); *see Acierno v. Worthy Bros. Pipeline Corp.*, 693 A.2d 1066, 1070 (Del. 1997).

[50] *Black Horse*, 2014 WL 5025926, at *12.

[51] *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1230 (Del. 2018).

[52] Opinion at *5.

[53] *Id.* at *4.

of any *exercise* of this Warrant."[54]  Patterson's signature on that document is the strongest objective evidence of Romeo Systems's intent to be bound.

It does not matter that Patterson only "glanced at" the Warrant before signing and did not realize that Cannon had altered the Draft Warrant.[55]  A "failure to read a contract provides no defense against enforcement of its provisions where the mistake sought to be avoided is unilateral and could have been deterred by the simple, prudent act of reading the contract."[56]  This rule applies with particular force to sophisticated commercial actors like Patterson, who at the time was CEO and sole director of a Delaware corporation represented by outside counsel, and who acknowledged at trial that he could have read the Warrant in full, run a redline against the Draft Warrant, or forwarded the document to counsel.  Patterson's failure to do any of those things offers no escape from the Warrant's clear terms.[57]

---

[54] *Id.* (emphasis added).

[55] Appellant's Opening Br. at 35–39; Opinion at *5 n.36.

[56] *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 3247992, at *4 n.19 (Del. Ch. Oct. 6, 2009) (quoting 27 Williston on Contracts § 70.113 (4th ed. 2009)), *aff'd*, 985 A.2d 391 (Del. 2009) (TABLE); *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 677 (Del. 2013) ("[A] failure to read bars a party from seeking to avoid or rescind a contract.").

[57] *Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 711 (Del. 2019) ("When an experienced party does not bother to read what he knows will be the binding agreement, a court must be exceedingly careful before allowing him to escape the consequences of that agreement, lest the court undercut the reliability of all written contracts, a reliability critical to their important role in facilitating useful commercial relations.").

Patterson argues that the Court of Chancery's decision in *Kotler v. Shipman Associates, LLC* holds that a signatory is not bound to contract terms surreptitiously altered by a counterparty without disclosure.[58] Patterson reads *Kotler* to protect him here because Cannon's Christmas Day 2015 email contained no redline or notice of the revisions that she had made. We read *Kotler* differently. There, a consultant unilaterally altered a forfeiture provision that the company had repeatedly rejected, then attached the CEO's signature page to the consultant's revised version without ever circulating the revised version to the company or its counsel.[59] The company had no opportunity at all to read the document to which it was purportedly bound. Unlike the company in *Kotler*, Patterson had ample time to read the Warrant and simply declined to do so.[60]

---

[58] Appellant's Opening Br. at 36–38 (citing *Kotler v. Shipman Assocs., LLC*, 2019 WL 4025634, at *17 (Del. Ch. Aug. 21, 2019)).

[59] *Kotler*, 2019 WL 4025634, at *17–*18.

[60] Any remaining doubt about Romeo Systems's manifested assent is dispelled by Patterson's re-execution of the Warrant on July 18, 2018. At Webb's request, and in connection with the Company's cleanup of its corporate records, Patterson executed the Warrant a second time via DocuSign, nearly three years after the original execution, with the 1%-at-exercise terms appearing on the face of the document exactly as they had in December 2015, and only days after KPMG flagged the discrepancy between the Warrant's fixed-percentage terms and the Company's fixed-share treatment of it. *See* Opinion at *6, *14 n.132. Patterson's December 2015 "glance" explanation cannot explain his second execution of the same document nearly three years later.

We therefore affirm the Court of Chancery's conclusion that the Warrant is a valid and enforceable contract between Romeo Systems and Cannon for one percent of Romeo Systems's Common Stock Deemed Outstanding at the time of exercise.

**2. The Pledge Agreement's description of the collateral reasonably identified the Warrant.**

Although we agree with the Court of Chancery's conclusion regarding Romeo Systems's intent to be bound by the Warrant, we diverge from the court in its conclusion that the Warrant's description in the Pledge Agreement was insufficient. A security interest attaches to collateral only when, among other things, "the debtor has signed a security agreement that provides a description of the collateral."[61] Under Section 9-108, a description of collateral "is sufficient, whether or not it is specific, if it *reasonably identifies* what is described."[62] A description reasonably identifies the collateral if it does so by "specific listing," "category," "quantity," "a computational or allocational formula or procedure," or "any other method, if the identity of the collateral is objectively determinable."[63] Delaware's UCC does not demand more; it expressly rejects any requirement that a description be "exact and

---

[61] 6 *Del. C.* § 9-203(b)(3)(A).

[62] *Id.* § 9-108(a) (emphasis added).

[63] *Id.* § 9-108(b)(1)–(6).

detailed."[64]  The description need only "make possible the identification of the collateral described."[65]

The Pledge Agreement described the collateral as "a warrant to purchase Common Stock in the Issuer [Romeo Systems] for one million shares."[66]  The Court of Chancery held that this description did not reasonably identify the Warrant because the Pledge Agreement described a fixed-share warrant for "one million shares," whereas Cannon held a fixed-percentage warrant.[67]  To the court, a fixed-share warrant and a fixed-percentage warrant are "at base, different types of warrants," rendering the description "not even close" to reasonably identifying the collateral that Cannon pledged.[68]

We see things differently.  Cannon held only one warrant to purchase Romeo Systems common stock.  She never held a second warrant, a fixed-share warrant, or any other instrument to which the Pledge Agreement's description reasonably could have referred.  The Pledge Agreement's description identified that single warrant by five attributes: (1) the type of instrument (a warrant); (2) the quantity ("*a* warrant");

---

[64] *Id.* § 9-108 cmt. 2 ("This section rejects any requirement that a description is insufficient unless it is exact and detailed (the so-called 'serial number' test).").

[65] *Id.*

[66] Opinion at *6.

[67] *Id.* at *26.

[68] *Id.* at *25, *27.

(3) the underlying equity security (common stock); (4) the issuer (Romeo Systems); and (5) the holder (Cannon, as Pledgor).[69] Notwithstanding the discrepancy between a fixed-percentage and a fixed-share warrant, it would have been possible for a third party reviewing the Pledge Agreement to locate Cannon's warrant, confirm that it was the only Romeo Systems warrant that she owned, and identify it as the pledged collateral. The "identity of the collateral" therefore was "objectively determinable" within the meaning of Section 9-108.[70]

Section 9-108 does not require perfection. The question is whether the description, evaluated as a whole, reasonably identifies the collateral pledged.[71] Inaccuracies, even technical or typographic ones, do not defeat the sufficiency of a description when the description as a whole enables a third party to identify the collateral.[72] The United States Bankruptcy Court for the District of Kansas applied

---

[69] *See id.* at *6 (emphasis added).

[70] 6 *Del. C.* § 9-108(b)(6).

[71] *See, e.g.*, *In re Wharton*, 563 B.R. 289, 298–99 (B.A.P. 9th Cir. 2017) (description of collateral as a "1965 Corvette automobile" without other identifying details satisfied the "reasonably identifies" standard because the parties to the security agreement understood what was pledged); *River Oaks Chrysler-Plymouth, Inc. v. Barfield*, 482 S.W.2d 925, 927–28 (Tex. Civ. App. 1972) (description of vehicle by brand, year, model, speedometer reading, and license number reasonably identified the collateral under analogous Texas UCC provision).

[72] *See Bank of Middleton v. Town & Country Ford Tractor, Inc.*, 1979 WL 30047, at *589 (Wis. Cir. Ct. July 25, 1979) ("[M]inor discrepancies in otherwise accurate descriptions will not defeat security interests if the [description] would nonetheless enable third persons to identify the property."); *In re Bucala*, 464 B.R. 626, 631 (Bankr. S.D.N.Y. 2012) (holding that "to deny secured status . . . based upon a typographical error in the description of the collateral would represent a warrantless reliance on formalism and violate the general rule that the UCC be liberally

this principle to a similar fact pattern in *In re Brown*. There, the security agreement described the collateral as "7 shares of preferred stock" in an LLC. That description was facially inaccurate because LLCs issue membership interests rather than stock.[73] The court nevertheless held that the description provided "clues sufficient that third persons by reasonable care and diligence may ascertain the property covered," and a security interest in the membership interests accordingly attached.[74] The debtor owned only one kind of interest in the LLC, and the description's other attributes (the issuer, the quantity, and the security's preferred status) pointed unambiguously to that single asset. The same is true in this case: Cannon owned only one Romeo Systems warrant, and the Pledge Agreement's other attributes pointed unambiguously to that single warrant.

Cannon's reliance on *Pan Ocean Navigation, Inc. v. Rainbow Navigation, Inc.* does not support a different conclusion. In *Pan Ocean*, the Court of Chancery held that a purported pledge of "Tower Capital Corporation['s] . . . stock interest in Rainbow Navigation, Inc." failed to create a security interest because the documentary record was so contradictory about Tower Capital's relationship to the

---

construed and applied to promote its underlying purposes and policies") (internal quotation marks and citations omitted).

[73] *In re Brown*, 479 B.R. 112, 119 (Bankr. D. Kan. 2012).

[74] *Id.* (internal quotation marks and citations omitted).

Rainbow Navigation stock that "one cannot with any confidence know from the description of the collateral contained in the claimed security agreement what is the body of collateral in which an interest is purportedly created."[75] The description therefore was "fatally obscure."[76] Here, by contrast, the Pledge Agreement's description pointed to Cannon's only Romeo Systems warrant. Although the description mischaracterized the warrant's exercise rights, that mischaracterization did not prevent reasonable identification or defeat the description's sufficiency under Section 9-108. Accordingly, we conclude that a security interest attached to the Warrant under Section 9-203(b).

## B. Patterson's November 2018 transfer of the Warrant was not an unlawful strict foreclosure under Section 9-620.

Our holding that a security interest attached to the Warrant requires reversal of the Court of Chancery's conversion judgment, which rested on the premise that Patterson lacked any lawful authority over the Warrant when he caused Romeo Systems to transfer it into his name in November 2018, exercised it in part in October 2020, and retained the resulting Romeo Power shares.[77] Cannon nevertheless argues

---

[75] *Pan Ocean Navigation, Inc. v. Rainbow Navigation, Inc.*, 1987 WL 13519, at *7 (Del. Ch. July 8, 1987) (describing a record in which Tower Capital was at various times associated with different entities, the subject of an undelivered certificate, and the subject of conflicting representations in shareholder agreements).

[76] *Id.*

[77] Opinion at *32–*34.

that we can affirm the conversion judgment on an alternative ground. She contends that even if Patterson held a valid security interest, his November 2018 transfer of the Warrant into his own name "in satisfaction of the loan" was an ineffective strict foreclosure under 6 *Del. C.* § 9-620, and that noncompliance itself amounted to conversion.[78] We disagree.

The November 2018 transfer was a contractual self-help remedy under Paragraph 8(a), not an acceptance of collateral under Section 9-620. Section 9-620 governs a secured party "accept[ing] collateral in full or partial satisfaction of the obligation it secures."[79] It is one of several post-default remedies available under Article Nine, distinct from the secured party's right under Section 9-609 to take possession of the pledged collateral and from the secured party's right under Section 9-610 to dispose of the collateral by sale, lease, license, or other commercially reasonable means.[80] An effective acceptance under Section 9-620 extinguishes the

---

[78] Appellee's Answering Br. at 34–37. Cannon's strict-foreclosure theory rests on two contemporaneous characterizations of the November 2018 transfer: (1) the Romeo Systems Board resolution authorizing the transfer recited that "Mr Patterson and [Ms.] Cannon have agreed to satisfy the Cannon Loan by transferring the Cannon Warrant to Mr. Patterson"; (2) the message from David Hernand, Romeo Systems's deal counsel, to Cannon's counsel that "the warrant was transferred to Mr. Patterson in satisfaction of the loan amount" and therefore "Cannon no longer has an interest in such warrant." *See also* App. to Appellee's Answering Br. at B0090–96.

[79] 6 *Del. C.* § 9-620(a).

[80] *See id.* §§ 9-609, 9-610; *see, e.g.,* 6 *Del. C.* § 9-620 cmt. 2 (describing strict foreclosure as a means of acquiring the debtor's interest without a Section 9-610 disposition).

secured obligation in whole or in part and transfers all of the debtor's rights in the collateral to the secured party.[81] Accordingly, Section 9-620 imposes strict procedural requirements to protect the debtor: the secured party must send the debtor a proposal in a signed record, and the debtor must either consent in a signed record or fail to object within twenty days.[82]

Patterson's November 2018 transfer of the Warrant did not extinguish Cannon's debt. It was instead an exercise of Patterson's contractual self-help remedy under Paragraph 8(a) of the Pledge Agreement, which authorized Patterson

> after the occurrence and during the continuance of a default . . . without notice and at [his] option, [to] transfer or register the Pledged Assets or any part thereof into [his] or [his] nominee's name with or without any indication that such Pledged Assets is subject to the lien created hereunder.[83]

That language expressly disclaims any notice requirement and makes no reference to satisfaction of the underlying debt. Section 9-620 is triggered by the secured party's election to accept the collateral in satisfaction of the obligation, an election that Paragraph 8(a) neither makes nor authorizes. Retitling the Warrant in Patterson's name was not the proposal in a signed record that Section 9-620 requires. Paragraph 8(b) of the Pledge Agreement separately preserves Patterson's right to

---

[81] *Id.* § 9-622(a)(1)–(2).

[82] *Id.* § 9-620(a)(1)–(2), (c).

[83] App. to Appellant's Opening Br. at A1737 (Pledge Agreement ¶ 8(a)).

28

dispose of the Pledged Assets after default in accordance with the rights and remedies of a secured party under the UCC.[84] Patterson's invocation of Paragraph 8(a) therefore placed record ownership of the Warrant in his name; it did not extinguish Cannon's obligation, and Cannon retained her right under Section 9-623 to redeem the Warrant by tendering payment of the loan, accrued interest, and reasonable expenses.[85]

Cannon argues that the Romeo Systems Board resolution and the Hernand letter establish that Patterson took the Warrant "in satisfaction" of the debt within the meaning of Section 9-620.[86] Neither communication, however, qualifies as a proposal sent to Cannon under Section 9-620(a).[87] The Board resolution speaks to Patterson's accounting with Romeo Systems regarding the registration of the Warrant. The Hernand letter was sent more than two years after the November 2018

---

[84] *Id.* (Pledge Agreement ¶ 8(b)).

[85] *See* 6 *Del. C.* § 9-623(b)–(c).

[86] Appellee's Answering Br. at 11–12, 39; *see also* App. to Appellee's Answering Br. at B0096 (Romeo Systems Board resolution reciting that "Mr. Patterson and [Ms.] Cannon have agreed to satisfy the Cannon Loan by transferring the Cannon Warrant to Mr. Patterson"); App. to Appellee's Answering Br. at B0090–91 (Letter from David Hernand, Paul Hastings LLP, to Marc Indeglia, Cannon's attorney, (November 27, 2020) (stating that "the warrant was transferred to Mr. Patterson in satisfaction of the loan amount" and that "Cannon no longer has an interest in such warrant")); Opinion at *9.

[87] 6 *Del. C.* § 9-620(a).

29

transfer.[88]  A secured party's subsequent characterization of a Section 9-609 transfer cannot retroactively convert it into a Section 9-620 acceptance where the procedural prerequisites of Section 9-620 were never invoked.  Because we hold that the November 2018 transfer was an exercise of contractual self-help rather than a Section 9-620 acceptance, Cannon's alternative conversion theory fails.[89]

Moreover, even if we accepted Cannon's characterization of the November 2018 transfer as a purported Section 9-620 acceptance, it would not give rise to conversion liability.  Section 9-620(a) requires the secured party to send the debtor a proposal in a signed record and either obtain the debtor's consent or wait twenty days without objection.[90]  Patterson did neither.  Section 9-620(b) provides that "[a] purported or apparent acceptance of collateral . . . is ineffective" unless the

---

[88] Opinion at *8–*9 (noting that the Hernand letter was sent on November 27, 2020, in response to Indeglia's November 23, 2020 inquiry, more than two years after the November 16, 2018 transfer).

[89] Patterson separately contends that Paragraph 17 of the Pledge Agreement, which exculpates him from liability for "any acts, omissions, errors of judgment or mistakes of fact or law . . . with respect to the Pledged Assets" absent gross negligence or willful misconduct, independently bars Cannon's conversion claim.  Appellant's Opening Br. at 40–44; App. to Appellant's Opening Br. at A1738 (Pledge Agreement ¶ 17).  The Court of Chancery declined to reach the argument, holding that Patterson had waived it by failing to argue specifically that the exculpation provision would apply if no security interest attached to the Warrant.  Opinion at *29.  Because we hold that a security interest did attach and that Patterson's November 2018 transfer of the Warrant did not give rise to conversion liability, we need not decide whether the exculpation provision would otherwise have barred Cannon's claim, and we express no view on the Court of Chancery's waiver ruling or on the enforceability of Paragraph 17 as applied to the conduct at issue.

[90] 6 *Del. C.* § 9-620(a)(1)–(2), (c).

30

conditions of subsection (a) are met.[91]   Therefore, even if the November 2018

transfer were a purported acceptance, it was ineffective.  An ineffective acceptance

does not transfer the debtor's interest in the collateral.[92]   The debtor retains her

redemption right under Section 9-623; the secured party retains his security interest

and may still proceed to dispose of the collateral by commercially reasonable means

under Section 9-610.[93]   Section 9-620(b) accordingly preserves the debtor's interest

in the collateral notwithstanding the secured party's noncompliant conduct, and

therefore Patterson would not be liable for conversion from the November 2018

transfer.

## IV.   CONCLUSION

For the foregoing reasons, the judgment of the Court of Chancery is

**AFFIRMED** as to the validity and enforceability of the Warrant, **REVERSED** as

to the court's holding that no security interest attached and the resulting conversion

judgment.   This matter is **REMANDED** to the Court of Chancery for further

proceedings consistent with this opinion.  On remand, the Court of Chancery should

address the consequences of Patterson's subsequent exercise and disposition of the

---

[91] *Id.* § 9-620(b).

[92] *See id.* § 9-622(a) (specifying that an effective acceptance under Section 9-620 "discharges the obligation to the extent consented to by the debtor" and "transfers to the secured party all of a debtor's rights in the collateral").

[93] *Id.* §§ 9-610(a)–(b), 9-623(b)–(c).

31

collateral, including whether he satisfied his obligations as a secured party under Article Nine of the UCC. Jurisdiction is not retained.